HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EL-FATIH P. NOWELL,

                    Plaintiff,

v.

TRIMED AMBULANCE, LLC and KENT
FIRE DEPARTMENT REGIONAL FIRE
AUTHORITY aka PUGET SOUND
REGIONAL FIRE AUTHORITY and JOHN
DOES 1-4,

                    Defendants.

NO.   2:17-cv-01133-RSL

KENT FIRE DEPARTMENT
REGIONAL FIRE AUTHORITY'S
MOTION FOR SUMMARY
JUDGMENT

NOTE ON MOTION CALENDAR:
AUGUST 10, 2018

***ORAL ARGUMENT REQUESTED***

## I.   RELIEF REQUESTED

Pursuant to Fed. R. Civ. P. 56(a), Defendant Kent Fire Department Regional Fire Authority aka Puget Sound Regional Fire Authority (hereinafter "Kent Fire") respectfully requests that this Court grant summary judgment dismissal of all of plaintiff's claims with prejudice.

## II.   STATEMENT OF MATERIAL FACTS

On June 18, 2015, Kent Fire Engine 76, with Acting Captain Bob Backstein and Fire Fighters Nate Strobel and David White, were dispatched in response to a 911 call reporting a patient with chest

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 1

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1  and leg pain.  (Coluccio Decl., Ex. A.) The patient was identified as plaintiff El-Fatih Nowell, who was

2  found, in pain and acting unusual, by his co-workers at his office.  (*Id.*)  Mr. Nowell's supervisor, Carol

3  Forehand, contacted 911with a concern that he was suffering from a stroke or cardiac episode.  (*Id.* at

4  Ex. B at 14:12-20.)

5  **A.     Kent Fire Background.**

6          Kent Fire changed its name to Puget Sound Regional Fire Authority in 2017. (*Id.*, Ex. C at 5:20-

7  6:2.) In responding to EMS calls, Kent Fire sends three firefighters, an acting company officer, an

8  engineer, and a third person, out on all engines, and two out on aid cars, which are like an ambulance.

9  (*Id.* at Ex. D at 7:9-8:3.) The Emergency Medical Services (EMS) committee determines the protocols

10  for each type of call. (*Id.* at 8:4-9.)

11          Mr. Strobel is a 14-year veteran and Captain with Kent Fire and works in the training division

12  as an Emergency Medical Services (EMS) Captain.  (*Id.*, Ex. C at 5:14-25; 6:3-7.)  In that position, Mr.

13  Strobel runs the Emergency Medical Technician (EMT) through the fire academy for Puget Sound Fire

14  and is responsible for all logistics, including getting instructors/lecturers, giving lectures, coordinating

15  practical sessions, and coordinating ride-alongs and ER observations. (*Id.* at 8:2-10.) All firefighters

16  going through the academy obtain an EMT certification. (*Id.* at 8:24-10:14.)

17          Mr. White is a 28-year veteran and has been an Engineer with Kent Fire for twenty-five years.

18  (*Id.,* Ex. D at 5:17-25.)  In addition, Mr. White has been an acting captain for the last twenty-four years.

19  (*Id.* at 6:1-24.) Mr. White completed EMT training during the fire academy. (*Id.* at 16:1-4.) Mr.

20  Backstein is also a longtime Kent Fire veteran who recently retired.

21  **B.     Mr. Nowell's History of Stroke/TIA.**

22          June 18, 2015 was not Mr. Nowell's first encounter with emergency personnel. In February

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 2

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

2013, Mr. Nowell suffered from a Transient Ischemic Attack (TIA), which is considered a mini-stroke, in his home. (*Id.,* Ex. E at 27:8-28:14.) Mr. Nowell began to have sharp chest pains, eventually becoming numb and fainting. (*Id.* at 28:16-29:11.) Alone at the time, Mr. Nowell called a family member and eventually his wife. (*Id.* at 30:5-32:9.) Mrs. Nowell, who was at work at the time, called 911. (*Id.* at 32:11-19.)

The medics arrived and forced entry through the locked front door. (*Id.* at 32:20-33:25.) The medics checked Mr. Nowell out and determined that he needed immediate medical attention, explaining the process to him. (*Id.* at 34:1-18.) Mr. Nowell agreed to go in the ambulance to be seen by a doctor. (*Id.* at 34:19-23.) During this encounter, the fire department was checking Mr. Nowell's vital signs, asking him questions, taking good care of him, and advising him to get checked out by a doctor. (*Id.* at 34:24-36:17.) Mr. Nowell was strapped onto the stretcher, which he understood was for his own safety. (*Id.* at 40:2-16.) Mr. Nowell noticed that he had slurred speech during the course of the incident. (*Id.* at 47:17-48:7.) At Valley Medical Center, Mr. Nowell was ultimately diagnosed with a TIA. (*Id.* at 46:14-15.)

**C.    Kent Fire's Response to the June 18, 2015 911 Call.**

In October 2014, Mr. Nowell started a temporary job as a cruise agent at Xerox in Kent, Washington. (*Id.* at 21:5-22:10.) While working at Xerox, Mr. Nowell was looking for and applying to other jobs. (*Id.* at 71:23-72:22; 74:8-75:2.) Mr. Nowell was not friendly with his co-workers, did not interact with anyone outside of work, did not eat lunch with anyone, and did not share personal information. (*Id.* at 79:9-23.)

On June 18, 2015, Mr. Nowell drove into the Xerox office from his home via backroads, passing by schools and residential areas, an approximately 25- to 30-minute, 11-mile drive. (*Id.* at 68:3-

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   69:9.) As of that date, Mr. Nowell had a perfect attendance record. (*Id.* at 69:15-22.) At some point,

2   Mr. Nowell started feeling pain in his chest and in his right leg. (*Id.* at 80:8-21.)

3      Mr. Nowell was first found by female coworkers doubled over in the elevator and having to

4   use the wall to hold himself up as he proceeded to go into the men's bathroom. (*Id.,* Ex. B at 9:7-19;

5   10:19-21.) The coworkers reported this to Ms. Forehand, who sent a male employee, David Demers,

6   to go into the restroom to check on Mr. Nowell, who appeared to be in discomfort and sweating.  (*Id.*

7   at 9:15-19; Ex. F at 9:6-14.) Mr. Demers found Mr. Nowell in the restroom sweating heavily and

8   disoriented. (*Id.,* Ex. F at 9:6-18; 11:23-12:8; 20:3-20.)  Mr. Nowell would not engage Mr. Demers for

9   some amount of time. (*Id.* at 12:1-8.) When asked if he was okay, Mr. Nowell said yes and that he

10  would like to go back to his desk. (*Id.* at 9:18-20.) Mr. Demers walked with Mr. Nowell back to Ms.

11  Forehand's office. (*Id.* at 9:20-22.) Mr. Nowell was unsteady as he walked, swaying in between steps.

12  (*Id.* at 14:11-15:4.) Mr. Demers, who had first aid and first responder training at a prior job, did not

13  believe Mr. Nowell was doing well. (*Id.* at 9:25-10:8; 16:13-20:2.)

14      When Mr. Nowell arrived at Ms. Forehand's office, she expressed her concern for his health

15  and asked whether or not there was someone she could contact for him. (*Id.* at 15:12-18.) Mr. Nowell

16  had experienced these pains for several hours before he spoke to Ms. Forehand, who asked him if he

17  was okay. (*Id.,* Ex. E at 82:2-21.) Mr. Nowell appeared to be in distress of some kind. (*Id.* at 83:7-85:8;

18  Ex. B at 11:23-12:5.)

19      Another Xerox supervisor, Shelly, advised Ms. Forehand that Mr. Nowell had a history of

20  stroke. (*Id.,* Ex. B at 12:1-5; 15:17-16:5; 27:11-16.) Ms. Forehand observed that Mr. Nowell's heart

21  was racing, he was slurring his speech, he was confused about where he was, and he was disoriented

22  about what was happening. (*Id.* at 13:13-22.) Before the incident, Ms. Forehand had spoken to Mr.

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    Nowell and was familiar with his voice and noticed that he was speaking noticeably different. (*Id.* at

2    13:23-14:10.) Ms. Forehand believed that Mr. Nowell needed immediate medical assistance. (*Id.* at

3    50:17-18.) Mr. Nowell admits that he was acting unusual at the time, in that he was sharing personal

4    information about his health with his co-workers. (*Id.,* Ex. E at 85:6-14.) He does not recall going to

5    the restroom or speaking to Mr. Demers. (*Id.* at 87:24-88:1; 106:6-12.)

6         As Mr. Nowell asked Ms. Forehand to contact his wife, Mr. Demers left the room. (*Id.,* Ex. F

7    at 15:14-18.) Ms. Forehand tried to get in touch with Mrs. Nowell but was unable to reach her. (*Id.,* Ex.

8    B at 33:2-8; Ex. C at 43:15-22.) Mr. Demers stayed nearby in the event medical professionals needed

9    assistance. (*Id.,* Ex. F at 16:3-9.) Mr. Demers believed that Mr. Nowell was exhibiting symptoms of a

10   heart attack or stroke due to his sweating, confusion, slurred speech, and extreme discomfort, and that

11   he needed immediate medical assistance. (*Id.* at 19:3-21:23; 32:16-34:2; 51:4-9.) Mr. Nowell told Ms.

12   Forehand that he was concerned about keeping his perfect attendance and that he wanted to work

13   through his shift. (*Id.,* Ex. E at 88:3-89:17.) Mr. Nowell was assured by Ms. Forehand that his

14   attendance record was not going to penalized and that she was concerned for his health. (*Id.,* Ex. B at

15   30:4-13.) Mr. Nowell expressed that he did not have medical insurance and Ms. Forehand told him not

16   to worry about it. (*Id.,* Ex. E at 106:1-9.) Mr. Nowell had been at Xerox long enough to qualify for

17   insurance. (*Id.,* Ex. B at 41:1-11; Ex. C at 45:3-17; Ex. D at 29:7-18.)

18        Ms. Forehand ultimately contacted 911 for immediate medical assistance. (*Id.,* Ex. F at 16:10-

19   21; Ex. B at 14:12-20.) Mr. Nowell did not object to Ms. Forehand calling 911, and he actually spoke

20   with the 911 operator. (*Id.,* Ex. B at 14:12-21; 16:7-24; Ex. E at 94:7-11.) He was aware that Ms.

21   Forehand was concerned about his wellbeing and the fact the he was having chest pains and wanted to

22   make sure he was okay. (*Id.,* Ex. E at 94:15-24.) Within minutes, Kent Fire arrived. (*Id.,* Ex. B at 17:4-

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 5

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   8; Ex. F at 23:16-20.)

2      Kent Fire Engine 76 was immediately dispatched for what was reported as a patient

3   complaining of chest and leg pain. (*Id.,* Ex. C at 22:21-23.) Mr. White's initial impression was that it

4   could be a cardiac call due to the report of chest pain. (*Id.,* Ex. D at 19:7-24.) Upon arrival, Ms.

5   Forehand met with Kent Fire and told them that Mr. Nowell was acting strangely and complaining of

6   pains. (*Id.,* Ex. C at 23:2-18.) From the time Ms. Forehand called 911 until Kent Fire arrived, Mr.

7   Nowell continued to exhibit the same symptoms. (*Id.,* Ex. B at 17:25-18:18.)

8      When Kent Fire arrived, they came to Ms. Forehand's office, began taking vitals, and asked

9   questions of Mr. Nowell, who was sitting in a chair. (*Id.* at 18:13-20.) Mr. Nowell understood that Kent

10  Fire was there to help him. (*Id.,* Ex. E at 97:22-98:1.) Ms. Forehand reported that Mr. Nowell's

11  coworkers found him unresponsive in the bathroom. (*Id.,* Ex. D at 23:24-25.) Mr. Strobel began

12  undertaking his assigned role of taking vitals. (*Id.,* Ex. C at 21:1-11; 23:19-24.) Mr. White was the

13  patient lead and did all of the patient questioning. (*Id.* at 21:17-22; 26:5-7.) Mr. Nowell was not

14  responding appropriately, taking a long time to answer questions. (*Id.,* Ex. D at 24:13-15.)

15     Mr. Nowell told Kent Fire of his history of TIA, chest, and leg pains. (*Id.,* Ex. E at 99:24-

16  100:25; Ex. D at 27:14-15.) While taking vitals, Mr. Strobel saw signs of a stroke or stroke-like

17  symptoms, in that Mr. Nowell was lethargic, had slurred speech, and would not focus on anything with

18  his vision. (*Id.,* Ex. C at 28:25-31:6.)  Mr. Nowell was unresponsive, taking a while to understand and

19  answer questions appropriately. (*Id.* at 30:1-10.) He did not recall the incident in the bathroom or

20  walking the hallway.  (*Id.* at 37:6-11; Ex. D at 27:1-3.) Ms. Forehand believed Mr. Nowell was

21  confused.  (*Id.,* Ex. B at 19:1-5.) Mr. Nowell does not recall repeating himself to Kent Fire. (*Id.,* Ex. E

22  at 106:13-15.)  Ms. Forehand indicated that Mr. Nowell was "not right." (*Id.,* Ex. D at 30:20-22.)

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 6

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    Kent Fire spent over thirty minutes working with Mr. Nowell, trying to figure out exactly what

2    his complaint was.  (*Id.,* Ex. C at 37:6-11; 39:13-18.)  Mr. Nowell remained confused and was not fully

3    coherent. (*Id.* at 37:6-11; 39:6-12.) Mr. White spoke to some of Mr. Nowell's co-workers. (*Id.,* Ex. D

4    at 36:15-21.) Given what the co-workers told Mr. White about Mr. Nowell's lack of responsiveness,

5    Ms. Forehand's indication that he was not right, and his history of TIA, Mr. White determined that Mr.

6    Nowell was not safe to drive and should get checked out by a doctor who could fully evaluate him for

7    a stroke/TIA. (*Id.* at 36:15-37:7.)

8        Based on how Mr. Nowell was acting and his complaints, Kent Fire recommended that Mr.

9    Nowell go to the hospital. (*Id.,* Ex. C at 37:13-15.) With his altered mental status, slurred speech, and

10   elevated systolic pressure, Kent Fire was concerned about a stroke. (*Id.* at 63:18-64:13.) When someone

11   suffers a stroke or TIA, the fire department allows doctors to make that determination. (*Id.* at 65:19-

12   66:4.)  During the encounter, Kent Fire expressed the desire to take Mr. Nowell to the hospital to get

13   checked out, the reasoning Mr. Nowell understood to be making sure he was okay. (*Id.,* Ex. E at 101:1-

14   6.)

15       Mr. Nowell told Kent Fire that he did not want to go to the hospital. (*Id.,* Ex. B at 19:21-24.)

16   Kent Fire tried to work with Mr. Nowell to coordinate a ride home from someone else. (*Id.,* Ex. C at

17   43:23-44:14.)  When Mr. Nowell expressed the wish to go to his own doctor, Kent Fire assisted him in

18   making the phone call.  (*Id.* at 42:1-43:6; Ex. D at 37:14-25.) Mr. Nowell's own physician did not

19   answer the phone and was unavailable to see him. (*Id.,* Ex. E at 102:7-14; 111:5-7.) Mr. White spoke

20   to the physician's receptionist, indicated that he was with the fire department, that he thought Mr.

21   Nowell may have had a TIA, and that they were going to send Mr. Nowell to the hospital, to which the

22   receptionist responded "okay." (*Id.,* Ex. D at 38:10-19.)

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

When Mr. Nowell's wife did not answer the phone, he indicated that there was no other friend or family member that could give him a ride. (*Id.* at 39:16-22; Ex. C at 44:9-14; 49:5-12.) Mr. White was open to having a co-worker drive Mr. Nowell, but Mr. Nowell refused. (*Id.,* Ex. D 42:17-19.) During this time, Mr. Nowell kept repeating conversations and concerns about his insurance and perfect attendance. (*Id.,* Ex. C 45:1-46:3.)

Mr. Nowell was adamant that he wanted to get behind the wheel of his car and drive. (*Id.* at 47:4-48:4; Ex. B at 19:21-24; Ex. D at 37:12-13; 40:24-41:5.) Admittedly, Mr. Nowell had never suffered from chest and leg pains at the same time or driven with that condition. (*Id.,* Ex. E at 117:1-8.) Ms. Forehand told Mr. Nowell that she did not feel comfortable with him getting in his car and driving and that they needed to figure out another option. (*Id.,* Ex. B at 19:25-20:8.) Due to Mr. Nowell's confusion, slurred speech, and the fact that he could not walk down the hall under his own power, Ms. Forehand did not believe he should be driving a car for his own safety and the safety of others.  (*Id.* at 20:9-13; 28:11-29:4.) Kent Fire told Mr. Nowell multiple times that he could not drive because it would put himself and others in danger. (*Id.,* Ex. C at 47:4-49:23; 56:11-14; Ex. G at 42:4-16.)  Nor did Mr. Demers believe that Mr. Nowell was in a state where he could safely get behind the wheel of a car and drive. (*Id.,* Ex. F at 25:4-7; 331:10-32:7.) Mr. Nowell was aware that Kent Fire did not want him to drive. (*Id.,* Ex. E at 114:7-10.) Mr. Nowell was extremely agitated. (*Id.,* Ex. B at 22:24-23:5; Ex. D at 70:16-17.)

TriMed Ambulance was dispatched to the scene to transport Mr. Nowell to the hospital and arrived with a stretcher outside Ms. Forehand's office to transport Mr. Nowell to the hospital. (*Id.,* Ex. B at 21:3-22:3.) Luis Szarko served as the TriMed driver, and his partner Scott McClaine was the lead technician. (*Id.,* Ex. H at 13:14-14:5.) During the course of the call, Mr. McClaine noticed that Mr.

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   Nowell had slurred speech. (*Id.,* Ex. G at 30:24-31:8.) Mr. McClaine was concerned about Mr.

2   Nowell's safety and thought he may be having a stroke. (*Id.* at 42:23-43:24.)

3        Suddenly, Mr. Nowell got up from his chair and started running towards the door, attempting

4   to run through Mr. Backstein who was in the doorway at the time. (*Id.,* Ex. C at 49:25-50:7; Ex. B at

5   22:4-8; Ex. D at 42:20-43:10; 44:16-19; 45:3-7; 75:19-76:3.) Based on Mr. Nowell's statements and

6   demeanor, Kent Fire assumed that he was attempting to take his keys, which were in hand, and drive

7   away. (*Id.,* Ex. C at 50:11-16; Ex. D at 47:17-21, 48:1-8, 53:17-25, 54:7-13.) Kent Fire's continued

8   concern was that Mr. Nowell would get behind the wheel of a car, have an episode and get into a wreck,

9   hurting himself or somebody else. (*Id.,* Ex. C at 60:8-25; Ex. D at 50:12-24.) Mr. Backstein bear hugged

10  Mr. Nowell and rolled him onto the gurney, holding his arm down so he could not hit Mr. Backstein.

11  (*Id.,* Ex. C at 50:17-51:14; Ex. D at 45:21-46:2.)  As Mr. Nowell began kicking, Mr. Strobel came and

12  held down his legs.  (*Id.,* Ex. C at 51:24-52:2; Ex. D at 48:19-25.) Mr. Backstein was calm, explaining

13  to Mr. Nowell that he could not drive.  (*Id.,* Ex. C at 51:17-20.) Mr. White explained to Mr. Nowell

14  that the only right he did not have was to drive away in the condition he was in.  (*Id.,* Ex. D at 55:10-

15  23.) Mr. Nowell's actions and his alone dictated the decision to restrain him.  (*Id.* at 72:7-11.)

16        Mr. Nowell was restrained consistently with King County EMS protocols and standards. (*Id.,*

17  Ex. C at 59:21-60:22; Ex. I.) He was restrained because he was a risk of harm to himself and others.

18  (*Id.,* Ex. C at 60:8-22; 61:17-62:17; Ex. D at 70:20-71:21.) Kent Fire used only the force necessary to

19  safely restrain Mr. Nowell. (*Id.,* Ex. D at 71:22-25.) Mr. Nowell was restrained safely. (*Id.,* Ex. G at

20  44:10-17.) TriMed applied the soft restraints. (*Id.,* Ex. C at 52:12-25; Ex. G at 35:23-36:12, 41:8-14.)

21  Mr. Nowell was combative.  (*Id.,* Ex. C at 54:8-14; Ex. D at 70:18-19; Ex. G at 36:13-23, 38:1-5, 40:7-

22  20.)  Mr. Nowell never indicated that he was in pain or hurt during the restraint and Ms. Forehand did

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 9

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   not perceive an injury. (*Id.,* Ex. B at 32:19-22; Ex. C at 53:19-54:1; Ex. D at 72:1-6.)

2          Mr. Nowell's recollection differs from other witnesses. (*Id.,* Ex. E.) Mr. Nowell claims that he

3   walked out of Ms. Forehand's office and told Kent Fire and TriMed that he was fine and wanted to

4   leave.  (*Id.* at 119:20-122:20.)  Then, Mr. Nowell claims that Kent Fire and TriMed began pushing him

5   into a seated position on the stretcher. (*Id.* at 129:13-130:22.) When Mr. Nowell tried to walk away, he

6   claims he was wrestled to the ground by three firefighters and two medics, and lifted on the stretcher.

7   (*Id.*)  He claims he was slammed on the ground and stretcher, his right arm twisted around his neck

8   causing his shoulder to pop. (*Id.* at 121:5-10.) He claims that he exclaimed for help and was told he did

9   not have any rights.  (*Id.* at 121:2-20.)  Mr. Nowell claims he never made physical contact with one of

10  the firefighters. (*Id.* at 126:9-11.) Mr. Nowell's perceptions are not material.

11         The Kent Police Department was called as standard protocol to place an involuntary

12  commitment hold on Mr. Nowell in order to transport him to the hospital. (*Id.,* Ex. C at 58:1-6; Ex. D

13  at 49:9-50:4.)  Once restrained to the gurney, Mr. Nowell became completely nonresponsive. (*Id.,* Ex.

14  C at 57:16-22; Ex. B at 31:5-25.)  Based on Mr. McClaine's observations, he believed transport to the

15  hospital and an involuntary commitment was appropriate. (*Id.,* Ex. G at 63:1-24.) Mr. Nowell's

16  demeanor was uncooperative and aggressive towards Kent Fire. (*Id.,* Ex. F at 25:23-26:1; Ex. B at 32:5-

17  8; Ex. D at 70:12-15.)  He was taken to the back of the TriMed ambulance, and Kent Fire had no further

18  interaction with him. (*Id.,* Ex. C at 58:7-59:20; Ex. D at 54:14-55:9.)

19         Ms. Forehand and Mr. Demers did not see Mr. Nowell again after he was taken downstairs.

20  (*Id.,* Ex. B at 23:14-15.) Mr. Demers found Kent Fire and TriMed to be incredibly professional and

21  concerned with helping Mr. Nowell. (*Id.,* Ex. F at 24:11-25:3.) Kent Fire and TriMed had Mr. Nowell's

22  best interests at heart and believed the safest place for him was a hospital. (*Id.* at 24:14-22.)

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 10

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    Kent Fire and TriMed were professional and took great care to make sure Mr. Nowell was not

2    injured. (*Id.* at 29:17-22; Ex. B at 28:8-10.)  Kent Fire and TriMed were not cruel or odd, and all words

3    used during the exchange were driven towards Mr. Nowell's care as opposed to how difficult he was

4    acting. (*Id.,* Ex. F at 29:23-30:9.)  There was no animus towards Mr. Nowell. (*Id.,* Ex. F at 30:10-13;

5    Ex. B at 29:12-16, 18.)  During Ms. Forehand's tenure at Xerox, she witnessed several visits from Kent

6    Fire and Mr. Nowell was not treated any differently. (*Id.,* Ex. B at 29:15-16, 18-21.)

7    Kent Police Officer John Dorff and his field training officer Justin Davis responded to the scene.

8    (*Id.,* Ex. J, at 8:8-9:2.)  Officer Dorff has been involved in hundreds of involuntary commitments over

9    the course of his thirteen-year career. (*Id.* at 13:20-14:9.)  Only law enforcement can involuntarily

10   commit a patient. (*Id.* at 15:3-14; Ex. C at 71:7-72:5.)  It is not abnormal for Officer Dorff to respond

11   to a scene, such as in this case, where a patient has already been restrained to a gurney by medical

12   professionals. (*Id.,* Ex. J at 15:3-17.)  In his experience, if after his investigation Officer Dorff

13   determines that a patient does not need to be committed, he will not issue an involuntary hold. (*Id.* at

14   28:3-15.)  In this instance, there was nothing abnormal in how either Kent Fire or TriMed handled Mr.

15   Nowell's situation prior to Officer Dorff's arrival. (*Id.* at 16:18-17:7.)

16   During the 30 minutes Officer Dorff was on the scene, Mr. Nowell refused to speak with him.

17   (*Id.* at 11:2-14; Ex. E at 132:25-133:21.)  Mr. Demers spoke with Officer Dorff and reported that Mr.

18   Nowell was slurring his speech and wincing in pain. (*Id.,* Ex. F at 34:11-36:11; Ex. J at 13:1-10, Ex.

19   2.)  Ms. Forehand also spoke to Officer Dorff and explained why she had called the paramedics and

20   why she was concerned about Mr. Nowell. (*Id.,* Ex. B at 23:16-24:1.) Through his interviews with

21   coworkers, Kent Fire, and a discussion with his field officer Justin Davis, Officer Dorff concluded that

22   with Mr. Nowell's slurred speech, refusal to speak, distant stare, lack of cooperation, and history of

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   stroke, he should be medically checked out. (*Id.,* Ex. J at 9:8-10:22.) Officer Dorff determined that Mr.

2   Nowell was unable to care for himself and was suffering from medical problems and issued an

3   involuntary commitment order. (*Id.* at 11:15-12:25, Ex. 2.)

4         During transport to the hospital, Mr. Nowell refused to talk to the TriMed workers, and his

5   blood pressure was elevated. (*Id.,* Ex. G at 55:7-13; Ex. H at 16:5-24.) In addition, Mr. Nowell was not

6   alert, confused, and only oriented to himself. (*Id.,* Ex. G at 29:6-19; 47:25-49:7.) TriMed's report also

7   indicates that Mr. Nowell had a history of stroke and high cholesterol, and Mr. McClaine indicated that

8   Mr. Nowell had a Glascow Coma Scale of 14, with a verbal score of 4, indicating that he was confused.

9   (*Id.* at 31:9-24; 33:21-34:14.) TriMed Ambulance took Mr. Nowell to his preferred hospital, Auburn

10  Medical Center. (*Id.* at 58:22-25; Ex. E at 133:22-134:9.) Upon arrival at the ER, Mr. Nowell declined

11  to be treated and did not identify any injuries. (*Id.* at Ex. 3.)

12  **D.    Mr. Nowell's Claims.**

13        Mr. Nowell never returned to work at Xerox. (*Id.,* Ex. B at 34:18-20; Ex. F at 36:12-17.) One

14  week later, on June 25, 2015, he filed a notice of claim with the City of Kent.[1] (*Id.,* Ex. E at 169:18-21,

15  Ex. 3.) On July 10, 2015, he served notice of a lawsuit on Kent Fire. (*Id.,* Ex. K.)

16        Mr. Nowell was not seen by a doctor until three weeks later on July 6, 2015. (*Id.,* Ex. E at Ex.

17  3.) While Mr. Nowell claimed to have suffered a shoulder injury as a result of the subject incident, an

18  x-ray revealed no such injury. (*Id.* at 187:12-18.) On July 20, 2015, Mr. Nowell filed a claim with the

19

20  _____

[1] Though Mr. Nowell did not return to work, he did communicate with co-worker Michael Sibanda, asking him to serve
as a witness. Mr. Sibanda was not involved in the incident, only observing what happened from his desk more than 20
feet away from Ms. Forehand's office. (Coluccio Decl., Ex. L at 16:9-10.) Mr. Sibanda did not intervene or speak to

21  Kent Fire, TriMed, Kent Police, any of the Xerox employees involved, or Mr. Nowell that day. (*Id.* at 22:5-19; 24:8-
25:6.) Mr. Sibanda only heard "the gist of what was going on," and did not know what symptoms Mr. Nowell was

22  suffering from. (*Id.* at 36:15-24; 37:5-8.) Mr. Sibanda's recollection is not material to this motion.

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 12

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    Department of Labor & Industries for an alleged shoulder injury arising out of the subject incident.  (*Id.*

2    at Ex. 4.)  Having already left Xerox and started a new job as of September 2015, Mr. Nowell was

3    referred for a psychiatric consultation and no longer appears to be pursuing the claim.  (*Id.* at 202:2-

4    203:4, Ex. 4.)

5            On June 14, 2017, Mr. Nowell filed the subject lawsuit in King County Superior Court. (Dkt.

6    5-3.)  Defendant Kent Fire subsequently removed the case to federal court.  (Dkt. 1.)  Mr. Nowell

7    asserts claims under 42 U.S.C. § 1983 for violations of his Fourth, Fifth, and Fourteenth Amendment

8    rights for alleged excessive force, as well as common law claims for assault and battery, false

9    imprisonment, and negligence.  (Dkt. 5-3.)

10                        **III.    STATEMENT OF ISSUES**

11           Should the Court dismiss all claims against Kent Fire, when there is no evidence that the Kent

12   firefighters were acting under color of state law, when there is no evidence that the force they used was

13   excessive, and when Mr. Nowell was suffering from a medical emergency (a probable stroke/TIA) and,

14   after refusing several alternative options to leaving the scene without driving himself, he charged at a

15   fire fighter, posing a safety risk to himself and others?

16                        **IV.    EVIDENCE RELIED UPON**

17           Defendants rely upon the pleadings and documents on file herein, as well as the Declaration of

18   Megan M. Coluccio with attached exhibits.

19                        **V.    AUTHORITIES AND ARGUMENT**

20   **A.  Summary Judgment Standard.**

21           Summary judgment is appropriate when, viewing the facts in the light most favorable to the

22   non-moving party, there is no genuine issue of material fact which would preclude the entry of

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 13

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The party seeking summary dismissal of the

2   case "bears the initial responsibility of informing the district court of the basis for its motion and

3   identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions

4   on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine

5   issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R.

6   Civ. P. 56(c)).  Once the moving party has satisfied its burden, it is entitled to summary judgment if

7   the non-moving party fails to designate "specific facts showing that there is a genuine issue for

8   trial." *Id.* at 324.

9       The "mere existence of a scintilla of evidence in support of a non-moving party's position is

10  not sufficient," and factual disputes whose resolution would not affect the outcome of the suit are

11  irrelevant to the consideration of a motion for summary judgment.  *Arpin v. Santa Clara Valley*

12  *Transp. Agency,* 261 F.3d 912, 919 (9th Cir. 2001); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

13  248 (1986).  In other words, "summary judgment should be granted where the nonmoving party

14  fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton*

15  *Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

16      **B.  The Court Should Dismiss Mr. Nowell's 42 U.S.C. § 1983 Claims.**

17      Mr. Nowell asserts federal claims under 42 U.S.C. § 1983 for violations of his Fourth, Fifth,

18  and Fourteenth Amendment rights for alleged excessive force.  Mr. Nowell cannot meet his burden

19  of proof with respect to such claims.

20      ***1.  Kent Fire Did Not Act Under Color of Law.***

21      In order to sustain a cause of action under § 1983, Mr. Nowell must show (1) that he suffered

22  a violation of his rights protected by the Constitution or created by federal statute, and (2) that the

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 14

1   violation was proximately caused by a person acting under color of state law.  *Parratt v. Taylor,*

2   451 U.S. 527, 535 (1981); *Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991).  "There is no

3   'rigid     formula'    for    determining    whether    a    state    or    local    law    official    is

4   acting under color of state law."  *Anderson v. Warner,* 451 F.3d 1063, 1068 (9th Cir. 2006).

5   "Rather, it is a process of 'sifting facts and weighing circumstances' which must lead us to a correct

6   determination."  *McDade v. West,* 223 F.3d 1135, 1140 (9th Cir. 2000) (citations omitted).

7        The acts of a public official are not automatically considered to be under color of law merely

8   because he committed the act while on duty and in uniform. *Van Ort v. Estate of Michael*

9   *Stanewich,* 92 F.3d 831, 838 (9th Cir.1996) (citing *Gibson v. City of Chicago,* 910 F.2d 1510, 1516

10  (7th Cir.1990)).  Instead, a government employee "acts under color of state law while acting in his

11  official capacity or while exercising his responsibilities pursuant to state law."  *McDade,* 223 F.3d

12  at 1140.  A public employee may also act under color of law when taking an action in pursuit of a

13  government objective, pretending to act under color of law, or using his government position to

14  "exert influence and physical control."  *Van Ort,* 92 F.3d at 838.

15       The Ninth Circuit has identified three requirements that must be satisfied in order to

16  demonstrate that an off-duty police officer acted under color of law: (1) the action at issue was

17  'performed while the officer is acting, purporting, or pretending to act in the performance of his or

18  her official duties; (2) the officer's pretense of acting in the performance of his duties must have had

19  the purpose and effect of influencing the behavior of others; and (3) the action at issue was related

20  in some meaningful way either to the officer's governmental status or to the performance of his

21  duties.  *Anderson,* 451 F.3d at 1068-69 (citing *McDade,* 223 F.3d at 1140).  Here, while Kent Fire

22  was on duty and responding to a medical emergency, the firefighters were not acting to further a

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 15

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    law enforcement investigation or administrative or governmental purpose.  Instead, Kent Fire was

2    acting for the independent interest of public safety by preventing Mr. Nowell from driving a car,

3    endangering himself and others.  Because Kent Fire was not acting under color of law, Mr. Nowell's

4    42 U.S.C. § 1983 claims should be dismissed.

5                    *2.  Mr. Nowell's Fourth Amendment Claim Fails.*

6            Assuming, arguendo, that the Court finds Kent Fire did act under color of law, Mr. Nowell

7    must establish that his Fourth, Fifth, or Fourteenth Amendment rights were violated for his 42

8    U.S.C. § 1983 claim to be successful.  Mr.  Nowell's primary claim is for excessive force under the

9    Fourth Amendment. (Dkt. 5-3.)  The standard for analyzing excessive force claims was established

10   in *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865 (1989).   Excessive force claims are

11   evaluated under the Fourth Amendment's reasonableness standard, and the court considers (1) the

12   severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the

13   officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by

14   flight.'" *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).  However, the *Graham* Court

15   did not limit the inquiry to those factors.  *See Graham*, 490 U.S. at 396; *Smith*, 394 F.3d at 701.  The

16   Ninth Circuit also considers the availability of alternative methods of capturing or subduing a

17   suspect.  *Smith*, 394 F.3d at 703.  Additionally, reasonableness is assessed from the perspective of

18   an objectively reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and

19   must allow for the fact that "police officers are often forced to make split-second judgments – in

20   circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is

21   necessary in a particular situation." *Graham*, 490 U.S. at 396.

22           Finally, a *de minimus* use of force cannot ground an *excessive* force claim under the Fourth

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 16

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Amendment. *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment"); s*ee also,* *Tuttelman v. City of San Jose*, 420 Fed. Appx. 758, 763 (9th Cir. 2011) (unpublished) (scuffle with police, which included an officer grabbing the plaintiff's right wrist, is the sort of *de minimus* use of force that cannot ground an excessive force claim under the Fourth Amendment) *(citing United States v. Alzerez-Tejeda*, 491 F.3d 1013, 1017 (9th Cir. 2007); *Busch v. Torres,* 905 F. Supp. 766, 772 (C.D. Cal. 1995) (to prevail on excessive use of force claim requires proof of significant physical injury) (*citing Johnson v. Morel,* 876 F.2d 477, 480 (5th Cir. 1989)).

Mr. Nowell's case is unique in that it involves a fire department's response to a medical emergency. The Sixth Circuit case *Hill v. Miracle,* 853 F.3d 306 (6th Cir. 2017), is instructive. In *Hill,* a sheriff's deputy responded to a diabetic emergency and ultimately had to use force to subdue the patient. 853 F.3d at 310-11. Plaintiff made constitutional, battery, and emotional distress claims. *Id.* at 311. The *Hill* Court made an alteration to the *Graham* factors in order to apply them to a medical emergency situation so that the actions could be evaluated as to whether they were objectively reasonable in light of the facts and circumstances confronting the officer. *Id.* at 312-16. The Court found that where the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer, the court should ask:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

*Id.* at 314.

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

Applying the *Graham* and *Hill* factors to this case, Mr. Nowell's excessive force claim fails. First, Mr. Nowell can present no evidence of a significant injury. Second, Kent Fire treated Mr. Nowell, who was experiencing a medical emergency, a probable stroke, rendering him incapable of making rational decisions and which posed an immediate threat of harm to himself and the general public, as demonstrated by his insistence on driving. Third, Mr. Nowell initiated physical contact with Kent Fire Fighter Bob Backstein, by physically running into him in an attempt to get to his car and drive away, down residential streets and where a school was located.  Mr. Nowell was agitated, aggressive, and combative with Kent Fire. Fourth, Kent Fire used only the force necessary to restrain Mr. Nowell, with Mr. Backstein bear hugging him and rolling Mr. Nowell to the gurney while holding Mr. Nowell's arm to avoid being hit, Mr. Strobel holding down Mr. Nowell's legs as he kicked.  Mr. Nowell was restrained consistent with EMT protocols, and only until TriMed was able to apply soft restraints. Mr. Nowell was restrained because he demonstrated that he was a risk of harm to himself and others. Kent Police independently assessed the situation and issued an involuntary hold. Finally, at no point did Mr. Nowell indicate to anyone that he was either in pain or injured as a result of the restraint, including the emergency room physician from whom he declined treatment.

Further, though Mr. Nowell has failed to articulate a deprivation of liberty claim, such a claim cannot be sustained based on the facts herein. "It is quite plain that the Fourth Amendment governs 'seizures' of the person," even if they do not result in an arrest "in traditional terminology." *Terry v. Ohio,* 392 U.S. 1, 16 (1968). Nonetheless, the protections of the Fourth Amendment only extend to unreasonable seizures.

While no case law exists addressing this issue with respect to a firefighter, in a Ninth Circuit

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    case involving a security guard, the Court adopted the *Graham* analysis in the context of an

2    unconstitutional "seizure" of a plaintiff who was trying to enter a private party at a restaurant.

3    *Bracken v. Okura,* 955 F.Supp.2d 1138 (9ᵗʰ Cir. 2013). There the Court held that whether "a

4    particular seizure is reasonable under the Fourth Amendment requires a careful balancing of 'the

5    nature and quality of the intrusion on the individual's Fourth Amendment interests' against the

6    countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (internal quotations

7    omitted). The Court held, "While the "reasonableness" inquiry "must be judged from the perspective

8    of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," it is always an

9    objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of

10   the facts and circumstances confronting them, without regard to their underlying intent or

11   motivation." *Bracken*, 955 F.Supp.2d at 1154, citing *Graham,* at 397.

12          Another Ninth Circuit case addresses Fourth Amendment seizure issues with respect to a

13   bus driver for the local transportation authority. *Arpin v. Santa Clara Valley Transportation*

14   *Authority,* 261 F.3d 912 (9th Cir. 2001). There, a bus driver summoned the sheriff's office and a

15   transportation authority supervisor to his bus, where plaintiff had presented an expired bus pass. *Id.*

16   In addressing the plaintiff's Fourth Amendment false imprisonment claim asserted against the bus

17   driver, the Ninth Circuit held:

18              [F]or the conduct of a non-law enforcement governmental party, …
                to be subject to the Fourth Amendment, [the plaintiff] must show that
19              [the defendant] acted 'with the intent to assist the government in its
                investigatory or administrative purposes, and not for an independent
20              purpose.' If [the plaintiff] shows that [the defendant's] conduct is
                subject to the Fourth Amendment, [the defendant] violated [the
21              plaintiff's] Fourth Amendment rights if, under the circumstances
                apparent at the time, [the defendant] unreasonably caused the
22              restriction of [the plaintiff's] liberty.

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 19

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

*Id*. at 924; *see Wallace by Wallace v. Batavia School Dist.,* 68 F.3d 1010, 1014 (7th Cir.1995) (non-law enforcement government actor violates the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent).

Here, Mr. Nowell can present no evidence that Kent Fire acted unreasonably under the circumstances. Mr. Nowell himself admits he had every intention of getting behind the wheel of his car and driving. Kent Fire was concerned with Mr. Nowell's and the general public's safety. Further, Mr. Nowell was not "seized" until Mr. Nowell initiated physical contact by running into Mr. Backstein. The reasonableness of Kent Fire's handling of the case was independently confirmed by Kent Police's issuance of an involuntary hold after a separate investigation.  Mr. Nowell's Fourth Amendment Claim should be dismissed.

### 3. Mr. Nowell Has Failed to Establish a Fifth Amendment Claim.

Mr. Nowell's Complaint fails to articulate a Fifth Amendment claim.  (Dkt. 5-3.)  The Fifth Amendment protects an individual's right against self-incrimination.  U.S. Const. amend. V. Though no case law exists with respect to a fire department, cases involving law enforcement are instructive. Generally, law enforcement officers are required to inform suspects of their Fifth Amendment rights before conducting a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). A custodial interrogation is "questioning, initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444. Generally, coercive police questioning does not violate the Fifth Amendment, absent use of the statements in a criminal case. *Chavez v. Martinez*, 538 U.S. 760, 766 (2003). Here, no statements provided by Mr. Nowell were used in a criminal case and this claim should be dismissed.

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 20

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

### 4.  Mr. Nowell Has Failed to Establish a Fourteenth Amendment Claim.

Likewise, Mr. Nowell's Complaint fails to articulate a Fourteenth Amendment claim. (Dkt. 5-3.) The Fourteenth Amendment of the United States Constitution provides that no person shall be deprived of life, liberty or property without due process of law. U.S. Const. amend. XIV. Notably, if a claim is properly brought under a more specific constitutional right, a Fourteenth Amendment claim alleging the same conduct will be dismissed. For example, there is no separate Fourteenth Amendment claim based upon allegations that mirror plaintiff's Fourth or Fifth Amendment claims. *See Fontana v. Haskin*, 262 F.3d 871, 881-82, (9th Cir. 2001), *citing County of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S. Ct. 1708 (1998).

Further, Mr. Nowell can present no evidence of an equal protection claim.  *See Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (Equal Protection claim requires proof of discriminatory intent or motive); *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (same); *Bingham v. City of Manhattan*, 341 F.3d 939, 948 (9th Cir. 2003) (it is not sufficient for plaintiff to simply argue he is black, officer is white, and they disagree about reasonableness of stop); *Benson v. City of San Jose*, 583 Fed.Appx. 604 (9th Cir. 2014) (a plaintiff must produce some tangible evidence that tends to support conclusion that seizure was racially motivated, for instance, evidence of pattern or practice of seizing African-Americans or that officer made racial remark during encounter). The Court should dismiss plaintiff's Fourteenth Amendment claim.

### C.  Mr. Nowell Cannot Sustain Claims For Assault and Battery.

An assault is an attempt, with unlawful force, to inflict bodily injuries upon another, accompanied with the present ability to give effect to the attempt if not prevented." *Brower v. Ackerley*, 88 Wn. App. 87, 92, 943 P.2d 1141 (1997). Assault is an intentional tort, which requires

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   the intent to bring about a result that will invade the interests of another in a way that the law will

2   not sanction. Restatement (Second) of Torts § 8A. There is no assault if the defendant is too far

3   away to do any harm. The defendant must instead have a present and apparent ability to carry out

4   the threatened harm. Furthermore, words alone, unaccompanied by other volitional acts or

5   circumstances that cause another reasonable apprehension of imminent harmful or offensive contact,

6   are insufficient to amount to an assault. *Brower,* 88 Wn. App. 87; Restatement Second, Torts

7   § 3.  Intent covers a broader range than just the desire to bring about a result. It extends not only to

8   those consequences that are desired, but also to those that the actor causes. *Garratt v. Dailey,* 49

9   Wn.2d 499, 304 P.2d 681 (1956). However, there is no liability for the negligent creation of an

10  apprehension of harmful or offensive contact. Restatement Second, Torts § 34. Finally, the

11  apprehension by the plaintiff must be reasonable. Restatement Second, Torts § 27.

12        Battery is the intentional infliction of a harmful bodily contact.  *Garratt v. Dailey*, 46 Wn.2d

13  197, 200, 279 P.2d 1091 (1955).  The act must be done with the intention of bringing about a harmful

14  or offensive contact or the apprehension thereof, the contact must not be consensual, and the conduct

15  must not be otherwise privileged.  *Id*. at 200-01. Additionally, it is not necessary that the defendant

16  intended the specific harm that befell the plaintiff; it is the conduct that must be intended, not the

17  result.  *Swank,* 194 Wn. App. 67. Conduct that is merely negligent or grossly negligent, as opposed

18  to intentional, is not sufficient to establish a battery.

19        This case is similar to *State v. Jordan,* where a patient began assaulting EMTs and the fire

20  department before they restrained him.  187 Wn. App. 1022, 2015 WL 2164512 (2015) (unreported).

21  There, the Court found the patient did not have a subjective fear of imminent harm when he began

22  assaulting emergency personnel. Here, RCW 71.05.150, which addresses mental health and inability

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    to care for oneself, like RCW 70.96A.120(2), which deals with intoxication, proves a means for an

2    individual to be taken into protective custody. In *Jordan,* the Court held that a peace officer may

3    use reasonable force to protect himself to affect an involuntary custody.

4    Fire and medical personnel are given deference provided their intent is not to detain plaintiff

5    for investigation of a crime, but for concerns for the patient's well-being. *See U.S. v. Overton,* 600

6    Fed. Appx. 303 (6th Cir. 2014); *Peete v. Metro Gov't of Nashville & Davidson Cnty.,* 486 F.3d 217

7    (6th Cir. 2007).  It is undisputed that Mr. Nowell initiated physical contact with Mr. Backstein when

8    he attempted to run out of the office to drive his car.  Mr. Nowell has conceded that he knew Kent

9    Fire was present to help him.  It is undisputed that Mr. Nowell's coworkers, Kent Fire, TriMed, and

10   Kent Police were all concerned that Mr. Nowell may have been suffering from a stroke or TIA.

11   Kent Fire attempted to work with Mr. Nowell to find alternative means of transportation. It was Mr.

12   Nowell's actions that dictated his ultimate restraint as he demonstrated a risk of harm to himself and

13   others.  At no point did Mr. Nowell express an apprehension of physical injury, nor did he indicate

14   any such injury.  Summary judgment is warranted.

15   **D.  Mr. Nowell's False Imprisonment Claim Fails.**

16   "The gist of an action for false arrest or false imprisonment is the unlawful violation of a

17   person's right of personal liberty or the restraint of that person without legal authority." *Bender v.*

18   *City of Seattle*, 99 Wn.2d 582, 591, 664 P.2d 492 (1983).

19   > A person is restrained or imprisoned when he is deprived of either
     > liberty of movement or freedom to remain in the place of his lawful
20   > choice; and such restraint or imprisonment may be accomplished by
     > physical force alone, or by threat of force, or by conduct reasonably
21   > implying that force will be used.

22   *Id*. Additionally, the confinement must be complete.  If the plaintiff is aware of a reasonable avenue

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 23

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1  of escape, he cannot be said to be confined. *Id*

2    Here, Mr. Nowell was offered multiple options to leave without being taken to the hospital

3  by ambulance. Mr. Nowell refused these options and then initiated physical contact by running into

4  Mr. Backstein in an attempt to drive away. Again, there are no reported cases where a fire

5  department has been accused of false imprisonment, but generally fire personnel are given deference

6  as long as their intent is not to detain a person in an effort to investigate a crime but is based on

7  concerns for a patient's well-being. *See Hill,* 853 F.3d 306*; Overton,* 600 Fed. Appx. 303; *Peete,*

8  486 F.3d 217. Kent Fire's concern was the safety and well-being of Mr. Nowell and the general

9  public.  Summary judgment is appropriate.

10    **E. Mr. Nowell's Negligence Claim Cannot Co-Exist with His Intentional Tort and Constitutional Claims.**

11    Finally, Mr. Nowell asserts claims under Washington law for negligence. To establish

12  negligence, plaintiff must prove: (1) the existence of a duty; (2) breach of that duty; (3) resulting

13  injury; and (4) proximate cause.  *Musci v. Graoch Assocs. P'ship #12*, 144 Wn.2d 847, 854, 31 P.3d

14  684 (2001). A negligence claim cannot coexist with claims alleging an intentional assault, battery,

15  or use of force.  *See, e.g.*, *Vikhu v. City of New York*, No. 06-CV-2095 CPS JO, 2008 WL 1991099,

16  at *9 (E.D.N.Y. 2008); *Lucas v. District of Columbia*, 505 F. Supp. 2d 122, 126-27 (D.C.C. 2007);

17  *Oliver v. Cuttler*, 968 F. Supp. 83, 92 (E.D.N.Y. 1997); *Mazurkiewicz v. New York City Trans. Auth.*,

18  810 F. Supp. 563, 570-71 (S.D.N.Y. 1993). "Excessive force is a term of art denoting an act of

19  assault or battery by law enforcement officials committed in the course of their duties," *i.e.*, "there

20  is no such thing as a negligent assault." *Lucas*, 505 F. Supp. 2d at 126.  Thus, Mr. Nowell's

21  negligence claim should be dismissed.

22

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 24

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    Likewise, Mr. Nowell is incapable of establishing a claim for gross negligence. Gross

2    negligence is defined as "…the failure to exercise slight care.  It is negligence that is substantially

3    greater than ordinary negligence. Failure to exercise slight care does not mean the total absence of

4    care but care substantially less than ordinary care." WPI 10.07. Here, Kent Fire restrained Mr.

5    Nowell consistent with EMT protocols as he presented a danger to himself and others. This claim,

6    too, should be dismissed.

7    **F.  Kent Fire is Immune to Civil Liability Under RCW 71.05.120.**

8    Under Washington's Involuntary Treatment Act, RCW 71.05.010, *et seq.,* Kent Fire is

9    immune from civil liability because it acted in good faith and without gross negligence.  RCW

10   71.05.120.  Kent Fire substantively joins in TriMed's briefing on this issue.

11   **VI.    <u>CONCLUSION</u>**

12   The Court should grant summary judgment and dismiss all of Mr. Nowell's unsubstantiated

13   claims against Kent Fire with prejudice.

14   Respectfully submitted this 19th day of July, 2018.

15   CHRISTIE LAW GROUP, PLLC

16

17   By   */s/  Megan M. Coluccio*
     MEGAN M. COLUCCIO, WSBA #44178
     Attorney for Defendant Kent Fire Department
18       Regional Fire Authority aka Puget Sound
         Regional Fire Authority
19   2100 Westlake Avenue N., Suite 206
     Seattle, WA  98109
20   Telephone:  (206) 957-9669
     Fax:  (206) 352-7875
21   Email: megan@christielawgroup.com

22

KENT FIRE'S MOTION FOR SUMMARY
JUDGMENT (2:17-cv-01133-RSL) - 25

1

## <u>CERTIFICATE OF SERVICE</u>

2
     I hereby certify that on this 19th day of July, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will be distributed to the following:

3

Harold H. Franklin, Jr., WSBA #20486
4
Attorney at Law
459 Seneca Avenue N.W.
5
Renton, WA 98057
Email: haroldfranklin1@comcast.net
6
Attorney for Plaintiff

7
Dylan E. Jackson, WSBA #29220
J.C. Miller, WSBA #51932
8
Wilson, Smith, Cochran, Dickerson
901 Fifth Avenue, Suite 1700
9
Seattle, WA 98164
Email: jackson@wscd.com
10
Email: miller@wscd.com
Attorneys for Defendant Trimed Ambulance, LLC

11

12
CHRISTIE LAW GROUP, PLLC

13

14
By _____/s/ Megan M. Coluccio_____
MEGAN M. COLUCCIO, WSBA #44178
15
Attorney for Defendant Kent Fire Department
Regional Fire Authority aka Puget Sound
16
Regional Fire Authority
2100 Westlake Avenue N., Suite 206
17
Seattle, WA 98109
Telephone: (206) 957-9669
18
Fax: (206) 352-7875
Email: megan@christielawgroup.com

19

20

21

22

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669