UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EL-FATIH P. NOWELL,

     Plaintiff,

  v.

TRIMED AMBULANCE, LLC, *et al.*,

     Defendants.

No. C17-1133RSL

ORDER GRANTING IN PART
MOTIONS FOR SUMMARY
JUDGMENT

  This matter comes before the Court on the "Kent Fire Department Regional Fire Authority's Motion for Summary Judgment" (Dkt. # 21) and "Defendant TriMed Ambulance, LLC's Motion for Summary Judgment" (Dkt. # 24). Plaintiff asserts state and federal claims against defendants arising out of his involuntary detention and transport to a medical facility in June 2015. Defendants argue that they are statutorily immune from the state law claims and that the federal claims fail because defendants are not state actors and/or the force used to detain Mr. Nowell was not excessive.

  Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and identifying those portions of "the pleadings, the

ORDER GRANTING IN PART MOTIONS
FOR SUMMARY JUDGMENT

discovery and disclosure materials on file, and any affidavits" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient," and factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel,[1] the Court finds as follows:

Defendants' statements of the facts are starkly skewed in their favor, with unfavorable testimony dismissed as "perceptions [that] are not material." Dkt. # 21 at 10. See also Dkt. # 21 at 12 n. 1. When the record is reviewed in the light most favorable to plaintiff, a reasonable jury could find as follows:

On June 18, 2015, Mr. Nowell was not feeling well: he had chest pains and pain in his right leg/foot. Co-workers noticed that he seemed to be in distress, and a supervisor sent another employee into the bathroom to check on him. The employee found Mr. Nowell splashing water

---

[1] The evidence attached to the Declaration of Harold Franklin has been considered only to the extent that the documents appear to be what they purport to be and there is little doubt that counsel would be able to lay a proper foundation for the evidence at trial. Because the nature and extent of plaintiff's injuries are not at issue in this motion, the Court has not considered the third-party medical records attached to the declaration as Exhibits C and F.

TriMed's motion to dismiss under Rule 12(c) is DENIED. Drawing all reasonable inferences in favor of plaintiff, the allegations of the complaint state a plausible claim for relief.

on his face and "kind of just gathering himself." Dkt. # 22-1 at 166. Mr. Nowell was not particularly talkative and the co-worker did not want to badger him, but he thought Mr. Nowell was slightly disoriented and not quite steady on his feet. The co-worker walked Mr. Nowell to the supervisor's office.

In response to the supervisor's inquiries, Mr. Nowell told her that he was having a little chest pain and pain in his right leg/foot. She offered to call the medics, which Mr. Nowell declined for a number of reasons. First, he did not think whatever he was experiencing was serious. A couple of years earlier, Mr. Nowell had chest pains that quickly evolved into numbness and loss of consciousness: that episode alarmed him enough to want to seek medical care. This episode was different. The pain was minor, more of an ache, with no dizziness. He was feeling strong enough to continue to work. Second, Mr. Nowell wanted to complete his shift in order to keep his perfect attendance record intact. Finally, Mr. Nowell did not have insurance. The supervisor told him not to worry about the lack of insurance and pushed to call the medics so that they could check him out. Mr. Nowell acquiesced.

The Kent Fire Department arrived first. David White, a 25 year veteran fire fighter and engineer, led the three-person response team. After the team spoke with the employee who found Mr. Nowell in the bathroom, the supervisor, and Mr. Nowell, Mr. White saw reason for concern. Mr. Nowell did not remember having been in the bathroom, his symptoms were consistent with a heart attack, he was fairly slow in responding to the team's questions, and he was repeating things in response to those questions. On the other hand, Mr. Nowell was able to provide his medical history when asked, his vital signs and EKG readings were fine, he was consistently focused on maintaining his attendance record and avoiding uninsured expenses, he promised to follow up with his wife and doctor, and Mr. White felt that Mr. Nowell was improving as time went on. At that point, Mr. White concluded that no further medical interventions were needed: Mr. Nowell could continue working or make his way home as he saw fit.

The supervisor, however, caught Mr. White's attention and indicated that Mr. Nowell was not quite right. This "new" information was enough to make Mr. White reconsider, and he apparently decided that Mr. Nowell needed to be seen by a doctor immediately. From Mr. Nowell's perspective, the conversation went from, "well, all your signs are good and there does not seem to be anything wrong with you" to "although we don't see anything particularly alarming, we'd like to take you to the hospital just to be on the safe side." While Mr. Nowell was, at this point, apparently willing to give up on his perfect attendance record, he did not want an ambulance ride to the hospital given how he was feeling and his ambiguous insurance status. He tried to contact his own doctor to have the doctor assure the Fire Department that he was capable of making his own medical decisions, a plan that Mr. White seemed to support. Mr. Nowell was unable to get through to the doctor, however, and Mr. White felt that the conversation with the receptionist was "starting to go on and on and on and on, and we needed to determine what was going to happen with him, what we needed to do to resolve this or get it checked out." Dkt. # 22-1 at 66. Mr. White told the receptionist that they were going to take Mr. Nowell to the hospital.

While all this was happening, TriMed arrived with an ambulance. Two TriMed employees brought a gurney into the building and were standing outside the supervisor's office. Mr. Nowell began getting uncomfortable as he realized that Mr. White doubted his capacity as a patient to act on his own and was leaning toward a course of action that Mr. Nowell disagreed with. He left the supervisor's office, but was greeted by two other fire fighters and the two TriMed employees. He found himself seated on the gurney. When he tried to stand up, he was pushed back down. His steadfast insistence that he was fine, that there was no cause for alarm, and that he neither needed to go to the hospital nor could afford an ambulance ride fell on deaf ears. When he tried to walk away, the five men tackled him at Mr. White's direction, held his arms and legs down, and strapped him to the gurney.

After Mr. Nowell was restrained, Mr. White recognized they were in the midst of taking a person to the hospital against his will and that they needed to have Mr. Nowell involuntarily committed "to cover all the bases to make sure that legally what we were doing was okay." Dkt. # 22-1 at 77.[2] The Fire Department called the City of Kent Police Department. Officer Dorff arrived and spoke with Mr. White, the employee who found Mr. Nowell in the bathroom, and possibly one or two other witnesses. Plaintiff, who was by now in the back of the ambulance, had lost all confidence in the process and would not speak to the officer. Officer Dorff concluded that given Mr. Nowell's prior medical history, "his odd behavior and not cooperating with answering questions, that he should probably medically be checked out." Dkt. # 22-3 at 7. He completed an involuntary commitment report form noting that Mr. Nowell was unable to care for himself and had medical problems.

Mr. Nowell was transported to a hospital. One of the TriMed employees used plaintiff's phone to call his wife while they were enroute. When his wife arrived at the hospital, she insisted that the restraints be removed and that Mr. Nowell be seen by a doctor. After checking his vital signs and speaking with Mr. Nowell, the doctor found nothing wrong and no reason for alarm. Mr. Nowell went home with his wife. He filed this lawsuit two years later, alleging physical and emotional injuries caused by the conduct of defendants' employees. Plaintiff asserts claims of assault and battery, false imprisonment, negligence, unlawful seizure, and use of excessive force.[3]

---

[2] Mr. Nowell stated at his deposition that one of the responders openly expressed doubt about the propriety of what they were doing to him.

[3] Defendants' version of events differs from the above in at least two significant respects. First, defendants maintain that they were forced to detain Mr. Nowell because plaintiff insisted that he was going to drive himself home and therefore posed a risk to the communities and schools he would have passed along the way. Defendants go so far as to say that Mr. Nowell "testified unequivocally during his deposition that he had every intention of getting behind the wheel of his car and driving on public roads while suffering from stroke-like symptoms." Dkt. # 30 at 1. No citation to his deposition is provided

ORDER GRANTING IN PART MOTIONS
FOR SUMMARY JUDGMENT             -5-

**A. State Law Claims**

Defendants argue that plaintiff's state law claims are barred by RCW 71.05.120. The Kent Fire Department also argues that plaintiff has failed to establish the elements of his state law claims and that the negligence claim is incompatible with his allegations of intentional conduct.

**1. Statutory Immunity**

Chapter 71.05 of the Revised Code of Washington ("RCW") is designed to promote public safety and protect the health and safety of individuals by establishing procedures for the compelled evaluation and treatment of persons with serious mental disorders while protecting the person's individual rights. RCW 71.05.010.[4] The statute authorizes peace officers to detain and cause to be transported to a local emergency room persons who, as a result of a mental disorder, present an imminent likelihood of serious harm or are in imminent danger because of being gravely disabled. RCW 71.05.153(2). "Peace officer" is defined as a "law enforcement official" or one "specifically given peace officer powers."[5] A "mental disorder" is defined as "any organic, mental, or emotional impairment which has substantial adverse effects on an

---

and, having reviewed all of the transcript pages submitted by the parties, no such "unequivocal" statement of intent exists. A reasonable jury, looking at the record as a whole, could conclude that this "danger to others" or "public safety" argument is a post hoc rationalization for having overridden a patient's free will and power of consent. Second, defendants argue that Mr. Nowell attacked them when he charged the door of his supervisor's office, attempting to knock one of the fire fighters out of his way in his efforts to escape in his car. Plaintiff and at least one other witness disagree. The Court cannot resolve such factual disputes in the context of a motion for summary judgment.

[4] Statutory citations are to the version of the statute that was in effect at the time Mr. Nowell was detained and transported to the hospital.

[5] The only other persons authorized to initiate an involuntary commitment proceeding under the statute are "designated mental health professionals" and "designated crisis responders" appointed by a county or other authority to receive referrals, investigate, and evaluate whether a person presents a likelihood of serious harm, is gravely disabled, or is in need of treatment as a result of a mental disorder.

individual's cognitive or volitional functions." RCW 71.05.020(15).

There is no evidence in the record from which one could conclude that employees of the Kent Fire Department or TriMed are "peace officers" under the statute. In fact, one can reasonably infer that the employees were subjectively aware that they did not have the authority to take plaintiff into custody or to prepare a petition for initial detention as evidenced by the fact that they called in the police department in an effort to make right what they had already done. There is also very little evidence that could support a finding that Mr. Nowell was suffering from a "mental disorder" when defendants strapped him to the gurney (or even that defendants subjectively believed that he was cognitively or volitionally impaired at the time). A reasonable jury could conclude that Mr. White simply wanted plaintiff to get checked out by a doctor, thought plaintiff was making a bad choice, and took matters into his own hands. Even if the fire fighter thought that Mr. Nowell was "not right," there is ample support in the record for the conclusion that plaintiff was fully capable of comprehending his situation and the possible repercussions of the choice he was making.[6]

Defendants argue that, because they were involved in the decision to detain a person for evaluation and treatment under the involuntary commitment statute, they are immune from civil or criminal liability under RCW 71.05.120(1), which reads:

> No officer of a public or private agency, nor the superintendent, professional person in charge, his or her professional designee, or attending staff of any such agency, nor any public official performing functions necessary to the administration of this chapter, nor peace officer responsible for detaining a person pursuant to this chapter, nor any county designated mental health professional, nor the state, a unit of local government, or an evaluation and treatment facility shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer

---

[6] Given the statutory definitions of "imminent" and "likelihood of serious harm," a reasonable jury could also find that neither defendants nor Officer Dorff had reason to believe that Mr. Nowell presented an imminent likelihood of serious harm to others or to himself.

antipsychotic medications, or detain a person for evaluation and treatment:
PROVIDED, That such duties were performed in good faith and without gross
negligence.

The Court assumes, for purposes of this motion, that defendants' employees are officers of public or private agencies being sued for their decision to detain Mr. Nowell for evaluation and treatment. Nevertheless, there is a genuine issue of material fact as to whether defendants performed their duties in good faith and without gross negligence. A plain reading of the statute suggests that defendants do not have the power to detain and restrain anyone under the involuntary commitment statute. The facts in the record could support the reasonable conclusion that they were aware of that fact, which would negate any inference of good faith and support a finding of gross negligence. In addition, one could reasonably conclude that both the statute and the immunity provision are inapplicable because defendants detained Mr. Nowell in order to compel him to seek medical, not mental health, treatment. The jury will have to determine whether defendants acted in good faith and without gross negligence in the circumstances presented here.

**2. Assault and Battery**

Under Washington law:

A "battery" is an intentional and unpermitted contact with the plaintiff's person. A defendant is liable for battery if (a) he [or she] acts intending to cause a harmful or offensive contact with the [plaintiff or a third party], or an imminent apprehension of such contact, and (b) a harmful or offensive contact with the [plaintiff] directly or indirectly results. A bodily contact is offensive if it offends a reasonable sense of personal dignity. Thus, an offensive contact does not have to result in physical injury to constitute a battery.

Kumar v. Gate Gourmet Inc., 180 Wash. 2d 481, 504 (2014) (internal quotation marks and citations omitted). The Kent Fire Department cites an inapposite criminal case to argue that Mr. Nowell brought the battery upon himself when he "initiated physical contact" with the fire

ORDER GRANTING IN PART MOTIONS
FOR SUMMARY JUDGMENT            -8-

fighter who was standing in the door of the supervisor's office and/or thwarted defendants' attempts to find him an alternative means of transportation. These facts are disputed, however, and cannot support judgment in defendant's favor.

The Fire Department also cites to the involuntary commitment statute, presumably for the purpose of showing that the intentional and unwanted contact with plaintiff was privileged or otherwise legally permissible. As discussed above, defendants do not fall within the sphere of actors who are permitted to involuntarily detain and transfer a person and there is a dispute regarding their good faith and negligence in doing so.

**3. False Imprisonment**

Mr. Nowell was strapped down to a gurney by force and transported to a hospital for medical evaluation and treatments to which he did not consent and which he expressly refused. He was completely deprived of both his freedom of movement and his liberty to remain where he was. Bender v. City of Seattle, 99 Wn.2d 582, 591 (1983). The Fire Department argues that he was not falsely imprisoned, however, because he had "a reasonable avenue of escape," namely he could have acquiesced to the "multiple options" defendants offered to avoid being taken to the hospital. First, there is a dispute regarding what options defendants gave Mr. Nowell once Mr. White decided that plaintiff had to be seen by a doctor. More importantly, if the jury sides with plaintiff on the factual disputes, defendants' offers of unpalatable choices to avoid an unauthorized and illegal imprisonment do not justify the imprisonment.

Finally, the Fire Department argues that fire personnel are given free rein when interacting with the public as long as they are acting out of concern for the patient's well-being and not attempting to detain a person for purposes of investigating a crime. Dkt. # 21 at 24; Dkt. # 30 at 10. A string of Sixth Circuit cases is offered in support of this contention. In Washington, however, the power to detain and transport persons suffering from mental disorders against their will is prescribed by statute and, as discussed above, a reasonable jury could find that defendants

ORDER GRANTING IN PART MOTIONS
FOR SUMMARY JUDGMENT           -9-

acted outside any authority provided by that statute. Defendants are not entitled to judgment as a matter of law on the false imprisonment claim.

**4. Negligence**

The Kent Fire Department seeks dismissal of plaintiff's negligence claim on the ground that it is inconsistent and/or incompatible with his intentional tort claims and has therefore been waived, again relying on non-Washington case law. As a general matter, alternative claims may be pled and pursued as long as there is no inherent conflict. Plaintiff claims that defendants had a duty to exercise reasonable care when they evaluated him and assessed his need for further medical treatment and that they breached that duty resulting in his erroneous detention and compelled transport to the hospital. Proof of an unintentional breach of duty is in no way inconsistent with proof of a subsequent battery, even if the claims are intertwined such that the battery satisfies the injury element of the negligence claim.

**B. Section 1983 Claims**

Plaintiff alleges that defendants violated his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Defendants argue that they are not state actors for purposes of a claim under 42 U.S.C. § 1983 and that plaintiff has failed to present evidence from which a reasonable jury could find that there was a constitutional violation.

**1. State Actors**

Section 1983 imposes civil liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia," deprives or causes another to be deprived of the rights, privileges, and immunities secured by the United States Constitution. "Anyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983." Filarsky v. Delia, 566 U.S. 377, 383 (2012) (internal quotation marks and citation omitted). The "color of law" requirement of § 1983 excludes from the statute's reach purely private conduct, no matter how discriminatory or wrongful, so that states

are not held liable for conduct that they do not control. See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999).

The Fire Department defendants do not dispute plaintiff's allegation that the Kent Fire Department Regional Fire Authority is a municipal corporation[7] or that Mr. White and the other members of the response team were employed by the Fire Department in pursuit of their official duties when they interacted with plaintiff. Defendants acknowledge that a government employee "acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Dkt. # 21 at 15 (citing McDade v. West, 223 F.3d 1135, 1140 (9th Cir. 2000)). They nevertheless argue that they were not acting under color of state law or for any governmental purpose because they were "acting for the independent interest of public safety" when "preventing Mr. Nowell from driving a car, endangering himself or others." Dkt. # 21 at 16. This is an extraordinarily narrow view of state action for which no authority is cited. Whatever subjective "interest" motivated Mr. White and his team at the time, they were on the scene and in a position of control and power over Mr. Nowell only because they were clothed with the authority of the state. The Fire Department defendants were performing their official government functions as first responders for 9-1-1 calls: the fact that they may have taken public safety into account in carrying out those functions in no way abrogates their status as state actors.

---

[7] Municipalities and other local government units are "persons" that can be sued directly under § 1983 for monetary, declaratory, and injunctive relief when their conduct causes the alleged constitutional deprivation. Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978).

ORDER GRANTING IN PART MOTIONS
FOR SUMMARY JUDGMENT -11-

The TriMed defendants argue that they are not state actors because TriMed is a private entity.

> "Action taken by a private individual may be 'under color of state law' where there is 'significant' state involvement in the action." Howerton v. Gabica, 708 F.2d 380, 382 (9th Cir. 1983). The extent of state involvement in the action is a question of fact. Id. at 383. "The [Supreme] Court has articulated a number of tests or factors to determine when state action is 'significant.' " Id. at 382-383 (collecting cases). Under the joint action test, a private party acts under color of state law if "he is a willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 [] (1980). Under the governmental nexus test, a private party acts under color of state law if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 [] (1974); cf. Edmonson v. Leesville Concrete Co., 500 U.S. 614 [] (1991) (constitutional deprivation caused by private party involves state action if claimed deprivation resulted from exercise of a right or privilege having its source in state authority); West v. Atkins, 487 U.S. 42, 54 [] (1988) (a private physician under contract with a state to provide medical services to inmates was a state actor for purposes of section 1983).

Lopez v. Dep't of Health Servs., 939 F.2d 881, 883 (9th Cir. 1991). TriMed, like the private physician under contract in West v. Atkins, performs a function that would otherwise be performed by the state. The fact that the local government unit contracted out part of the tasks that make up the provision of emergency response services rather than having its own employees perform those tasks does not change the nature of the services TriMed was hired to provide, relieve the local government unit of its constitutional duties, or deprive those who may be injured by TriMed's conduct of the means of vindicating their constitutional rights. West, 487 U.S. at 55-56. While performing the state-delegated duties, TriMed is a state actor for purposes of § 1983.

TriMed correctly points out that private ambulance services generally do not act under color of state law when they are responding to a privately-placed 9-1-1 call. However, "if the

state is significantly involved in the specific activity of which the party complains," state action may exist. Lauderdale v. Permanente Med. Group, Inc., 845 F.2d 1029 (9th Cir. 1988) (unpublished decision). In Lauderdale, the private ambulance service and hospital were under contract with a local government unit to provide medical services, a fact which was sufficient to support a finding that they were acting under color of state law. In our case, TriMed not only contracted with the Kent Fire Department to provide the transportation services of which plaintiff complains, but its employees personally participated in a joint effort with the Fire Department employees to use force to detain and restrain plaintiff. In these circumstances, a reasonable jury could conclude that both the joint action and the nexus tests are satisfied.[8]

**2. Fourth Amendment Claim**

Plaintiff alleges defendants falsely imprisoned him and used excessive force in doing so, in violation of the Fourth Amendment's prohibition against unreasonable searches or seizures. Non-law enforcement government actors violate the Fourth Amendment if, under the circumstances apparent at the time, they impose an unreasonable restriction on plaintiff's liberty. Arpin v. Santa Clara Transp. Agency, 261 F.3d 912, 924 (9th Cir. 2001). Similarly, in determining whether a particular application of force to effect a seizure was unreasonable, the objective facts and circumstances confronting the government actors must be assessed. Chew v. Gates, 27 F.3d 1432, 1440 (9th Cir. 1994). The test is one of objective reasonableness: plaintiff need not prove that the government actors knew the imprisonment was unjustified or the force was excessive, just that the actions were objectively unreasonable in light of the facts and circumstances confronting them. Graham v. Connor, 490 U.S. 386, 397 (1989).

---

[8] TriMed attempts to distinguish Lopez, in which plaintiff's claims against a hospital and ambulance service were reinstated, and Lauderdale by arguing that the defendants in those cases had contracts with the forum state. These efforts are unavailing. First, the Lauderdale defendants had a contract with a county agency, not the state. Second, the phrase "state actor" encompasses municipalities and other local government units. The distinction identified by TriMed makes no difference to the analysis.

ORDER GRANTING IN PART MOTIONS
FOR SUMMARY JUDGMENT                -13-

Whether a seizure or use of force is reasonable requires a balance of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." U.S. v. Place, 462 U.S. 696, 703 (1983). In judging whether a state actor's conduct is reasonable in given circumstances, the Supreme Court weighs the risk of bodily harm that the state actor posed to plaintiff against the threat to the public that the state actor was trying to eliminate. Scott v. Harris, 550 U.S. 372, 383 (2007). The Sixth Circuit, when faced with a case in which a sheriff's deputy used force to subdue a patient who was suffering a diabetic emergency, found the traditional three-factor test set forth in Graham for assessing objective reasonableness[9] unhelpful since there was no crime at issue, no resisting arrest, and no threat to the officer. Hill v. Miracle, 853 F.3 306, 312-13 (6th Cir. 2017). It therefore crafted and applied a "more tailored set of factors to be considered in the medical-emergency context," including:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
>
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
>
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

Hill, 853 F.3d at 314.

The Court is unaware of any court in the Ninth Circuit that has adopted the "tailored" analytical framework espoused in Hill. One can argue that the traditional Graham test is

---

[9] The non-exhaustive Graham factors are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

ORDER GRANTING IN PART MOTIONS
FOR SUMMARY JUDGMENT                -14-

appropriately applied to medical emergency situations because, when no crime has been committed and no arrest is warranted, force can be justified only if "the suspect poses an immediate threat to the safety of the officers or others." Graham, 490 U.S. at 396. Assuming that applying the Graham factors to a medical emergency situation is, as the Sixth Circuit argued, "equivalent to a baseball player entering the batter's box with two strikes already against him," that does not necessarily mean that the correct response is to change the rules. Rather, it may simply be that the use of force in our society is, or should be, limited, and that physically compelling a patient to accept medical treatment – in the absence of an immediate threat to the safety of the officers or others – is unreasonable.

The Court need not decide this issue, however. Regardless whether the traditional Graham test or the tailored Hill test is applied, there are factual disputes which preclude entry of judgment in defendants' favor. Plaintiff has put forth evidence from which the jury could find that (a) defendants restrained Mr. Nowell and transported him to the hospital because they believed he should be checked out by a doctor, (b) plaintiff posed no risk to defendants, and (c) defendants' concern regarding Mr. Nowell's ability to drive is either a post-hoc rationalization for the seizure or did not pose "an immediate threat of serious harm" to others. If the jury finds for plaintiff, it could reasonably conclude that the use of force was unreasonable.

### 3. Fifth Amendment Claim

The Due Process and Equal Protection provisions of the Fifth Amendment to the United States Constitution "apply only to actions of the federal government - not to those of state or local governments." Lee v. City of Los Angeles, 250 F.3d 668, 687 (9th Cir. 2001). Plaintiff has not produced any evidence that could support a claim under the Fifth Amendment.

### 4. Fourteenth Amendment Claim

Plaintiff's Fourteenth Amendment claim is based on the same facts which give rise to his unreasonable seizure and excessive force claims. "If a constitutional claim is covered by a

specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998). Because the Fourth Amendment's prohibition against unreasonable seizures is the primary source of constitutional protection against physically abusive governmental conduct (Graham, 490 U.S. at 394), the Fourteenth Amendment claim must give way.

For all of the foregoing reasons, defendants' motions for summary judgment (Dkt. # 21 and Dkt. # 24) are GRANTED in part and DENIED in part. Plaintiff's Fifth and Fourteenth Amendment claims under 42 U.S.C. § 1983 are DISMISSED. Plaintiff's state law and Fourth Amendment claims may proceed.

Dated this 11th day of January, 2019.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge